## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

FLORAL NETWORK LLC,
d/b/a FLORAL NETWORK
733 Bishop Street, Suite 187
Honolulu, Hawaii 96813,
individually and on behalf of all others
similarly situated,

                    Plaintiff,

v.

ACE AVIATION HOLDINGS, INC., AIR
CANADA, AC CARGO LP, AIR
FRANCE ADS, AIR FRANCE-KLM
GROUP ADS, AIR FRANCE CARGO
ADS, AIR FRANCE-KLM CARGO ADS,
ASIANA AIRLINES INC., BRITISH
AIRWAYS PLC, CARGOLUX
AIRLINES INTERNATIONAL S.A.,
CATHAY PACIFIC AIRWAYS LTD.,
DEUTSCHE LUFTHANSA AG,
LUFTHANSA CARGO AG, JAPAN
AIRLINES INTERNATIONAL
COMPANY LTD., KOREAN AIRLINES
COMPANY LTD., LAN AIRLINES S.A.,
LAN CARGO S.A., ATLAS AIR
WORLDWIDE HOLDINGS, INC.,
NIPPON CARGO AIRLINES CO., LTD.,
POLAR AIR CARGO, INC., SAS AB dba.
SAS GROUP, SAS CARGO GROUP A/S,
SINGAPORE AIRLINES, LIMITED,
SINGAPORE AIRLINES CARGO PTE
LIMITED, SWISS INTERNATIONAL
AIR LINES LTD., UAL CORPORATION,
UNITED AIRLINES INC., UNITED
AIRLINES CARGO INC., VIRGIN
ATLANTIC AIRWAYS LIMITED,
INTERNATIONAL AIR TRANSPORT
ASSOCIATION, and JOHN DOES I-X,

                    Defendants.

Civil Action No. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, on behalf of itself and all others similarly situated, brings this action for treble damages and injunctive relief under the federal antitrust laws of the United States, Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Sections 4 and 26 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15, 26 ("Clayton Act") against Defendants. Plaintiff complains and alleges upon information and belief except as to those paragraphs applicable to the named Plaintiff, which are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.    This action arises from a global conspiracy to fix, raise, maintain, and/or stabilize prices for fuel, security and insurance surcharges in air cargo shipping ("Airfreight Shipping"). Surcharges are charged by major airlines acting as Airfreight Shipping providers ("Airfreight Carriers") that deliver the cargo placed by their customers, which are companies or individuals seeking to transport freight via air on behalf of themselves or others ("Airfreight Customers"). The Surcharges are fees charged to Airfreight Customers purportedly to compensate the Airfreight Carriers for certain external costs including increased costs for fuel, for additional security measures after the terrorist attack in the United States in September of 2001, for war-risk insurance premiums applied in conjunction with the outbreak of war in Iraq in 2003, and for other external costs (collectively the "Surcharges").

2.    Plaintiff, on behalf of all persons and entities that purchased airfreight cargo shipping services, for shipments within or to or from the United States, directly from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from no later than January 1, 2000 to the present (the "Class"), brings this action to recover treble damages and injunctive relief for violations of the United States antitrust laws.  At all relevant times herein, Defendants were Airfreight Carriers that charged Surcharges

to Airfreight Customers in the United States and throughout the world and, in the cases of the International Air Transport Association, a trade association that has numerous Airfreight Carriers among its members. As further alleged herein, during at least the period January 1, 2000 through the present (the "Class Period"), Defendants agreed, combined, and conspired with each other to fix, raise, maintain, and/or stabilize Surcharges. As a result of Defendants' unlawful conduct and conspiracy, Plaintiff and the other members of the Class paid artificially high Surcharges and have been damaged thereby.

### JURISDICTION AND VENUE

3.      This Complaint is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

5.      This Court has *in personam* jurisdiction over each of the Defendants because each was engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused injury to persons and entities residing in, located in, or doing business in the District of Columbia and throughout the United States.

6.      Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in this district, and because a substantial part of the

events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

7.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## PARTIES

8.     Plaintiff Floral Network LLC d/b/a Floral Network, a Hawaiian limited liability company, was at all relevant times an Airfreight Customer with its principal place of business at 733 Bishop Street, Suite 187, Honolulu, Hawaii 96813. During the Class Period, Plaintiff purchased airfreight cargo shipping services, for shipments within or to or from the United States, directly from one or more of the Defendants, and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

9.     Defendant ACE Aviation Holdings, Inc. ("ACE") is a foreign airline headquartered at 5100 de Maisonneuve Boulevard West, Montreal, Quebec H4A 3T2, Canada. ACE conducts Airfreight Shipping throughout the world, including into the U.S. and this district. ACE is the parent company of defendant Air Canada.

10.    Defendant Air Canada is a company organized under the laws of Canada with its headquarters located at 5100 de Maisonneuve Boulevard West, Montreal, Quebec H4A 3T2, Canada. Air Canada is a wholly owned subsidiary of Defendant ACE. Air Canada conducts Airfreight Shipping throughout the world, including into the U.S. and this district. On information and belief, and at all relevant times, ACE owned, dominated and controlled the business of Air Canada.

11.    Defendant AC Cargo LP ("AC Cargo") is a company organized under the laws of Canada with its headquarters located at 5100 de Maisonneuve Boulevard West, Montreal,

Quebec H4A 3T2, Canada. AC Cargo is a wholly owned subsidiary of Defendant ACE Aviation

Holdings, Inc. AC Cargo conducts Airfreight Shipping throughout the world, including into the

U.S. and this district. On information and belief, and at all relevant times, ACE owned,

dominated and controlled the business of AC Cargo.

12.    Defendants identified in the preceding three paragraphs are collectively referred

to herein as the "Air Canada Defendants."

13.    Defendant Air France ADS ("Air France") is a foreign airline headquartered at

45, rue de Paris 95747 Roissy-CDG Cedex, France, with a U.S. office in this district at 1120

Connecticut Avenue Northwest Suite 1050, Washington, DC 20036. Air France conducts

Airfreight Shipping throughout the world, including into the U.S. and this district. Air France is

a subsidiary of Air France-KLM Group ADR. On information and belief, at all relevant times,

the business of Air France was owned, dominated and controlled by Air France-KLM Group

ADR.

14.    Defendant Air France-KLM Group ADS ("Air France-KLM") is a foreign airline

headquartered at 45, rue de Paris 95747 Roissy-CDG Cedex, France, and maintains a U.S. office

in this district at 1120 Connecticut Avenue Northwest Suite 1050, Washington, DC 20036. Air

France-KLM conducts Airfreight Shipping throughout the world, including into the U.S. and this

district.

15.    Defendant Air France Cargo ADS ("Air France Cargo") is a foreign airline

headquartered at 45, rue de Paris 95747 Roissy-CDG Cedex, France, with a U.S. office in this

district at 1120 Connecticut Avenue Northwest Suite 1050, Washington, DC 20036. Air France

Cargo conducts Airfreight Shipping throughout the world, including into the U.S. and this

district. Air France Cargo is a subsidiary of Air France-KLM. On information and belief, at all

relevant times, Air France-KLM owned, dominated and controlled the businesses of Air France Cargo.

16.    Defendant Air France-KLM Cargo ADS ("Air France-KLM Cargo") is a foreign airline headquartered at 45, rue de Paris 95747 Roissy-CDG Cedex, France, with a U.S. office in this district at 1120 Connecticut Avenue Northwest Suite 1050, Washington, DC 20036. Air-France-KLM Cargo conducts Airfreight Shipping throughout the world, including into the U.S. and this district.  Air France-KLM Cargo is a subsidiary of Air France-KLM. On information and belief, at all relevant times, Air France-KLM owned, dominated and controlled the business of Air France-KLM Cargo.

17.    Defendants identified in the preceding four paragraphs are collectively referred to herein as the "Air France Defendants."

18.    Defendant Asiana Airlines Inc. ("Asiana Airlines") is a foreign airline headquartered at Asiana Twon Kangseo, P.O. Box 98 #47, Osae-Dong, Kangseo-Ku, Seoul, South Korea. Asiana conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

19.    Defendant British Airways PLC ("British Airways") is a foreign airline headquartered at Waterside, UB7 GB Harmondsworth, Middlesex, England, with a U.S. office in this district at Dulles International Airport, Cargo Building 3, Door 115, Washington, DC 20041. British Airways conducts Airfreight Shipping throughout the world, including into the U.S. and this district.  British Airways' cargo division is named British Airways World Cargo.

20.    Defendant Cargolux Airlines International S.A. ("Cargolux") is a company organized under the laws of Luxembourg with its headquarters located at Luxembourg Airport

L-2990, Luxembourg, Grand Duchy of Luxembourg. Cargolux conducts Airfreight Shipping throughout the world, including into the United States.

21.    Defendant Cathay Pacific Airways Ltd. ("Cathay Pacific") is a foreign airline headquartered at Hong Kong International Airport, 7/F North Tower, 8 Scenic Road, Cathay City, Lantau, Hong Kong. Cathay Pacific conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

22.    Defendant Deutsche Lufthansa AG ("Lufthansa AG") is a foreign airline headquartered at Von-Gablenz-Strasse 2-6, 50679 Köln, Germany, with a U.S. office in this district at 1101 Connecticut Ave. NW, Washington DC 20036. Lufthansa AG conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

23.    Defendant Lufthansa Cargo AG ("Lufthansa Cargo") is a foreign airline headquartered at Von-Gablenz-Strasse 2-6, 50679 Köln, Germany, and holds a U.S. office in this district at 1101 Connecticut Ave. NW, Washington DC 20036. Lufthansa Cargo conducts Airfreight Shipping throughout the world, including into the U.S. and this district. Lufthansa Cargo is a subsidiary of Lufthansa AG. On information and belief, at all relevant times, Lufthansa AG owned, dominated and controlled the business of Lufthansa Cargo.

24.    Defendants identified in the preceding two paragraphs are collectively referred to herein as the "Lufthansa Defendants."

25.    Defendant Japan Airlines International Company Ltd. ("JAL") is a foreign airline headquartered at 4-11, Higashi-shinagawa 2-chome, Shinagawa-ku, Tokyo 140-8637, Japan, with a U.S. office in this district at 1050 Connecticut Ave., N.W., Suite 200, Washington, DC 20036. JAL conducts Airfreight Shipping throughout the world, including into the U.S. and this district. JAL's cargo division is named JAL Cargo.

26.    Defendant Korean Airlines Company, Ltd. ("Korean Air") is a foreign airline headquartered at 1370 Gonghang-Dong, Gangso-Gu, Seoul, Korea.  Korean Air conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

27.    Defendant Lan Airlines S.A. ("Lan Airlines") is a company organized under the laws of the Republic of Chile with its headquarters located at Presidente Riesco 5711 Piso 20, Las Condes, Santiago, Chile, with a U.S. office in this district at 1717 K St NW, Washington, DC 20036.  Lan Airlines conducted Airfreight Shipping throughout the world, including into the U.S. and this district.

28.    Defendant Lan Cargo S.A. ("Lan Cargo") is a company organized under the laws of the Republic of Chile with its headquarters located at Presidente Riesco 5711 Piso 20, Las Condes, Santiago, Chile, with a U.S. office in this district at 1717 K St NW, Washington, DC 20036.  Lan Cargo conducts Airfreight Shipping throughout the world, including into the U.S. and this district.  Lan Cargo is a wholly owned subsidiary of Lan Airlines.  On information and belief, at all relevant times, Lan Airlines owned, dominated and controlled the business of Lan Cargo.

29.    Defendants identified in the preceding two paragraphs are collectively referred to herein as the "Lan Defendants."

30.    Defendant Nippon Cargo Airlines Co., Ltd. ("NCA") is a company organized under the laws of Japan with its headquarters located at Shiodome City Center 8F 5-2, Higashi-Shinbashi, 1-Chome, Minato-Ku, Tokyo 105-7108, Japan, and offices in this district at Cargo Building NO.5 Washington Dulles International Airport, Washington D.C. 20041.  NCA conducts Airfreight Shipping throughout the world, including into the U.S. and this District.

31.    Defendant Atlas Air Worldwide Holdings, Inc. ("Atlas") is a corporation organized under the laws of Delaware with its headquarters located at 2000 Westchester Avenue, Purchase, New York 10577. Atlas conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

32.    Defendant Polar Air Cargo, Inc. ("Polar Air") is a corporation organized under the laws of California with it headquarters located at 2000 Westchester Avenue, Purchase, New York 10577. Polar Air conducts Airfreight Shipping throughout the world, including into the U.S. Polar Air is a wholly owned subsidiary of Atlas. On information and belief, at all relevant times, Atlas owned, dominated and controlled the business of Polar Air.

33.    Defendants identified in the preceding two paragraphs are collectively referred to herein as the "Polar Air Defendants."

34.    Defendant SAS AB, dba. SAS Group ("SAS Group") is a foreign airline headquartered at Frösundaviks Allé 1, 195 87 Stockholm, Sweden with a U.S. office in this district at Ronald Reagan Washington National Airport, Washington, DC 20001. SAS Group conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

35.    SAS Cargo Group A/S ("SAS Cargo") is a foreign airline headquartered at Frösundaviks Allé 1, 195 87 Stockholm, Sweden, with a U.S. office in this district at Ronald Reagan Washington National Airport, Washington, DC 20001. SAS Cargo conducts Airfreight Shipping throughout the world, including into the U.S. and this district. SAS Cargo is a subsidiary of SAS Group. On information and belief, at all relevant times, SAS Group owned, dominated and controlled the business of SAS Cargo.

36.    Defendants identified in the preceding two paragraphs are collectively referred to herein as the "SAS Defendants."

356202-1

37.    Defendant Singapore Airlines Limited ("Singapore Airlines") is a company organized under the laws of Singapore with its headquarters located at Airline House, 25 Airline Road, Singapore 819829. Singapore Airlines conducts Airfreight Shipping throughout the world, including into the U.S.

38.    Defendant Singapore Airlines Cargo Pte Ltd ("SIA Cargo") is a company organized under the laws of Singapore with its headquarters located at 5th floor core L, SATS Airfreight Terminal 5, Superhub 1, 30 Airline Road, Singapore 819830. SIA Cargo conducts Airfreight Shipping throughout the world, including into the U.S. SIA Cargo is a wholly owned subsidiary of Singapore Airlines. On information and belief, at all relevant times, Singapore Airlines owned, dominated and controlled the business of SIA Cargo.

39.    Defendants identified in the preceding two paragraphs are collectively referred to herein as the "Singapore Air Defendants."

40.    Defendant Swiss International Air Lines Ltd. ("Swiss International") is a company organized under the laws of Switzerland with its headquarters located at Aeschenvorstadt 4, CH-4051 Basel, Switzerland. Swiss International conducts Airfreight Shipping throughout the world, including into the United States. Swiss International's cargo division is named SwissWorldCargo.

41.    Defendant UAL Corporation ("UAL") is a U.S.-based airline headquartered at 1200 E. Algonquin Rd., Elk Grove Township, Illinois, with an office in this district at Ronald Reagan Washington National Airport, Washington, DC 20001. UAL conducts Airfreight Shipping throughout the world, including into the United States and this district.

42.    Defendant United Airlines Inc. ("United Airlines") is a U.S.-based airline headquartered at 1200 E. Algonquin Rd., Elk Grove Township, Illinois, with an office in this

district at Ronald Reagan Washington National Airport, Washington, DC 20001. Unites Airlines conducts Airfreight Shipping throughout the world, including into the United States and this district. United Airlines is a subsidiary of UAL. On information and belief, at all relevant times, UAL owned, dominated and controlled the business of United Airlines.

43.     Defendant United Airlines Cargo Inc. ("United Cargo") is a U.S.-based airline headquartered at 1200 E. Algonquin Rd., Elk Grove Township, Illinois, with an office in this district at Ronald Reagan Washington National Airport, Washington, DC 20001. United Cargo conducts Airfreight Shipping throughout the world, including into the United States and this district. United Cargo is a subsidiary of Defendant United Airlines Inc. On information and belief, at all relevant times, United Airlines owned, dominated and controlled the business of United Cargo.

44.     On information and belief, at all relevant times, UAL owned, dominated and controlled the business of United Cargo.

45.     Defendants identified in the preceding four paragraphs are together collectively referred to herein as the "United Defendants."

46.     Defendant Virgin Atlantic Airways Limited ("Virgin Atlantic") is a company organized under the laws of England and Wales with its headquarters located at The Office, Crawley Business Quarter, Manor Royal, Crawley, West Sussex RH10 9NU, England. Virgin Atlantic conducts Airfreight Shipping throughout the world including through Virgin Atlantic Cargo, and including into the United States

47.     Defendants identified in paragraphs 9 through 46 are collectively referred to herein as the "Airfreight Carrier Defendants."

48.    Defendant International Air Transport Association ("IATA") is an international trade association with its U.S. headquarters located in this district at 1776 K Street N.W., Suite 400, Washington DC 20006.

49.    At all relevant times, all Airfreight Carrier Defendants named above were members of IATA.

## UNNAMED CO-CONSPIRATORS

50.    On information and belief, at all relevant times, other Airfreight Carriers, trade groups, or other entities, referred to herein as John Does I-X, willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

## AGENTS

51.    The acts alleged to have been done by Defendants were authorized, ordered or done by their directors, officers, agents, employees, or representatives while actively engaged in the management of each of the Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

52.    According to a 2004 report entitled "Freight Shipments in America" issued by the Department of Transportation's Bureau of Transportation Statistics (and available at (<http://www.bts.gov/publications/freight_shipments_in_america/statistics>), the amount of interstate/international commerce affected by Airfreight Shipping is enormous; the report indicates that in 2002 alone, the total value of goods transported by air was $770 billion.

53.    Throughout the Class Period, there was a continuous and uninterrupted flow of transactions and shipments in Airfreight Shipping in interstate and international commerce throughout the United States and the world.

54.     Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce to Airfreight Customers located in states other than the states in which Defendants are located, as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action on its own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All individuals or entities (excluding governmental entities, Defendants, and their parents, predecessors, subsidiaries, affiliates, and their co-conspirators) who purchased airfreight cargo shipping services, for shipments within or to or from the United States, directly from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from no later than January 1, 2000 to the present.

56.     Because such information is in the exclusive control of Defendants, Plaintiff does not know the exact number of Class members.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all Class members is impracticable.

57.     There are questions of law or fact common to the Class, including:

    a.     Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, and/or stabilize Surcharge prices charged in the United States and throughout the world;

    b.     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

    c.     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

d.     Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the businesses or property of Plaintiff and the other members of the Class;

e.     The effect of Defendants' conspiracy on the Surcharge prices charged in the United States and throughout the world during the Class Period; and

f.     The appropriate measure of damages sustained by Plaintiff and other members of the Class.

58.     Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of the Class members. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff directly paid Surcharges to one or more Defendants, and its interests are coincident with and not antagonistic to those of other members of the Class. Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

59.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

60.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties in management that would preclude maintenance as a class action. Finally, the Class is readily definable and is one for which records of the names and addresses of the members of the Class exist in the files of Defendants.

## DEFENDANTS AND THE AIRFREIGHT SHIPPING MARKET

61.    According to statistics disseminated by IATA, the global air cargo industry was estimated to be a $50 billion dollar business in 2005. It is also a business that has exhibited substantial traffic volume growth, averaging 6.3% from 2002 through 2005.

62.    The International Air Cargo Association ("TIACA") has disseminated two recent reports at its website (<http://www.tiaca.org/cm/G2/I226/>) by Airbus and Boeing Company ("Boeing") that forecast Airfreight Shipping growth. Airbus estimated that Airfreight Shipping would increase annually (as measured in FTKs (freight tonnes-kilometers)) by 5.9% between 2004 and 2023. Likewise, Boeing's most recent biennial "World Air Cargo Forecast" predicts that the global market for Airfreight Shipping will triple over the next 20 years, going from 156.5 billion RTKs (revenue tonnes-kilometers) in 2003 to 518.7 billion RTKs in 2023, a growth rate of about 6.2% per annum. The report notes that "[c]argo revenue represents, on average, 15% of total traffic revenue, with some airlines aiming to earn over half of their revenue from this source."

63.    TIACA's own analysis (available at <http://www.tiaca.org/content/TIACA-KI.pdf>) indicates that Airfreight Shipping accounts for about 40 percent of all global cargo shipments and 13 percent of total air traffic revenue.  IATA members, who include all Defendants, carry more than 40 million tons of cargo annually.

64.    Between 2000 and 2006, Defendants together handled an overwhelming percentage of this business.  Among the named Defendants are all three of the world's top five airfreight carriers (Defendant Korean Air, the Lufthansa Defendants, the Singapore Air Defendants, and Defendant Cathay Pacific, respectively) in terms of revenue or FTKs.

65. Defendants possess significant market share:

    a. In 2004, Defendant Air France merged with Defendant KLM, creating Defendant Air France-KLM, now Europe's largest airline.

    b. Defendant Air France's cargo unit, Defendant Air France Cargo, was itself the world's fifth-largest airline for air cargo transport; it then integrated its commercial activities with Defendant KLM Cargo, creating an even-larger entity, Defendant Air France-KLM Cargo.

    c. Defendant Asiana Airlines' cargo routes serve 16 countries and 24 Cities, on 21 routes. Asiana Airlines' cargo revenue was 29 percent of its total sales in 2004.

    d. Defendant British Airways is one of the top ten leading cargo airlines in the world and the United Kingdom's largest airfreight carrier.

    e. Defendant Lufthansa Cargo is the world's second-biggest international airfreight carrier. In 2004, the Lufthansa Defendants transported more than 1.75 million tons of freight and mail.

    f. For the October-December quarter of 2005, Defendant JAL's revenue in international cargo totaled 53.2 billion yen ($451 million), about 10 percent of JAL's overall revenue for that period.

    g. Defendant Korean Air's cargo division, Korean Air Cargo, is the world's largest commercial airline cargo enterprise; during 2004, Korean Air shipped 8.164 billion FTK. Cargo revenue was 32.7 percent of Korean Air's total sales in 2004.

    h. Revenues for 2004 for Defendant SAS Cargo were $7.1 billion.

    i. In 2002, the United Defendants' reported cargo revenue totaled $673 million.

66. The principal competitors for the Defendants in this global Airfreight Shipping services market are one another.

67. Airfreight Shipping services are a commodity product that are fungible in the sense that Airfreight Shipping services provided by any one Airfreight Carrier are readily substitutable for the Airfreight Shipping services provided by any other Airfreight Carrier.

68.     Airfreight Shipping services are homogenous services sold by Airfreight Carriers, including Defendants, to Airfreight Customers, including Plaintiff and the members of the Class, primarily based on price.

69.     The Airfreight Shipping service market in the United States and worldwide is highly concentrated, and there exist substantial barriers to entry in this market; both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by Defendants and alleged herein.

## DEFENDANT IATA FACILITATED THE CONSPIRACY

70.     IATA is an association whose members include 265 airlines from more than 140 nations worldwide.  Flights by IATA member airlines comprise 94 percent of all international scheduled air traffic.  In 2003, IATA Airfreight Carrier members carried more than 34.3 million tons of cargo; by 2005, this figure had grown to 40 million.

71.     According to its website (<http://www.iata.org/about/history.htm>), IATA is the "prime vehicle for inter-airline cooperation."

72.     The Defendants are on numerous IATA Committees that deal with various aspects of Airfreight Shipping.  For example, IATA's Cargo Committee (<http://www.iata.org/workgroups/cc.htm>) includes British Airways, Cargolux, Cathay Pacific, KLM, Korean Air, Lufthansa, and United Airlines. Likewise, IATA's Cargo Business Processes Panel includes representatives from Air Canada, Air France, British Airways, Cargolux, JAL, United Airlines, Cathay Pacific and Swiss International.

73.     The Defendants utilized IATA, with its blessing and encouragement, as a forum to engage in practices independent of tariff conferences that have no antitrust immunity, including the horizontal agreements on surcharges described herein.

356202-1

74.    Defendant IATA was aware of the Airfreight Defendants' Surcharge conspiracy, and participated in, coordinated, facilitated, and/or ratified the conspiracy and the illegal acts of the Airfreight Carrier Defendants as averred herein.

## GLOBAL AIRLINE ALLIANCES AND TRADE ASSOCIATIONS FACILITATED CONCERTED ACTION

75.    Several global airline alliances and trade associations exist to which multiple Defendants belong. These alliances facilitate cooperation between Defendants in determining, instituting, enforcing, and communicating about the Surcharges and their increases.

## WOW

76.    "WOW," a/k/a "New Global Cargo," is an alliance between four Airfreight Carriers founded in April of 2002, six months after the September 11, 2001 terrorist attacks. Its members are Lufthansa Cargo, SAS Cargo, and SIA Cargo and JAL Cargo.  The last of these entities joined the alliance in July of 2002.

77.    According to the initial WOW press release available at the alliance's website (http://www.wowtheworld.com/news_press1.html), WOW was expected to provide Airfreight Customers a portfolio of "*harmonized*" air cargo products, and "*synchronized*" sales and customer service activities.  The alliance's offerings were intended to provide greater "*consistency*." In short, the release concluded, the alliance "establishes *even closer links* between the three cargo carriers."

78.    By August 2003, WOW had captured a global market share of about 20 percent, making it the world's biggest air cargo alliance. (<http://www.wowtheworld.com/news_press8.html>).  The air cargo alliance currently holds a worldwide network of 523 destinations in 103 countries, a combined fleet of 43 freighters, and

the "bellyhold" capacity of more than 760 passenger aircraft. WOW is also introducing its own dedicated airport terminals, as well as its own cargo jets.

79.    WOW facilitated cooperation between these Defendants in determining, instituting, enforcing, and/or communicating about the Surcharges and their increases.

## Star Alliance

80.    Star Alliance is a global airline alliance dating from 1997 whose 16 members include the following Defendants: Asiana, the Lufthansa Defendants, the SAS Defendants, JAL, the United Defendants, the Air Canada Defendants, and Singapore Airlines.

81.    Star Alliance facilitated cooperation between these Defendants in determining, instituting, enforcing, and/or communicating about the Surcharges and their increases.

## SkyTeam Cargo

82.    SkyTeam Cargo is a global Airfreight Carrier alliance launched in September of 2000 whose current eight members include Defendants Air France Cargo and Korean Air Cargo. In 2004, SkyTeam Cargo carried 22.6 billion FTKs globally and generated a combined total revenue of $6.1 billion.

83.    SkyTeam Cargo facilitated cooperation between these Defendants in determining, instituting, enforcing, and/or communicating about the Surcharges and their increases.

## ONEWORLD ALLIANCE

84.    Oneworld Alliance is a global airline alliance whose members include Defendants British Airways, Cathay Pacific, and Lan Airlines.

85.    Oneworld facilitated cooperation between these Defendants in determining, instituting, enforcing, and/or communicating about the Surcharges and their increases.

## ASSOCIATION OF ASIA PACIFIC AIRLINES

86.     The Association of Asia Pacific Airlines ("AAPA") is the leading trade and

service organization for 17 major air carriers in the Asia Pacific region, including Defendants

Singapore Airlines, Asiana, JAL, Cathay Pacific, and Korean Air. In the year ending in March of

2005, its members carried 1.4 million tonnes of air cargo.

87.     AAPA facilitated cooperation between these Defendants in determining,

instituting, enforcing, and/or communicating about the Surcharges and their increases.

## DEFENDANTS' CONCERTED SURCHARGES

88.     Generally, surcharges are a feature of global freight transportation, in which

freight carriers, including Airfreight Carriers such as Defendants, negotiate to charge extra fees

to their shipping customers, above and beyond basic freight charges typically priced by weight or

volume, with the intent of defraying certain external costs of the carriers.

### Fuel Surcharge

89.     Beginning on or about January 1, 2000, Defendants agreed to act in concert with

one another in demanding the Surcharges, including a fuel cost surcharge ("Fuel Surcharge"),

from their Airfreight Customers.

90.     Defendants implemented their agreement by exchanging information in secret, by

publicly announcing agreed-upon surcharge increases, and by privately exchanging information

including Airfreight Customers' total airfreight costs charged within and to and from the United

States and elsewhere, for the purpose of monitoring and enforcing the agreed-upon surcharge

levels.

91.     For example, the Lufthansa Cargo Fuel Index is used by much of the air freight

industry as a benchmark for adjusting fuel surcharge levels. The company's website

(<http://www.lufthansa-cargo.com/US/content.jsp?path=0,19061,45236,45237,76432# >) states

356202-1

that "[t]he methodology and transparency of the Fuel Price Index has become a major indicator

in the airfreight business…." One publication describes it as an "industry benchmark."

(<http://www.kweusa.com/newsroom/IU/Industry%20Update%209.05.pdf >).

92.    Lufthansa's Fuel Index is published daily on the Lufthansa website

(<http://www.lufthansa-cargo.com/US/content.jsp?path=0,19061,45210,45212 >), and is tied to

the spot fuel prices in five geographic markets.  Until August of 2005, the index's methodology

stated that if the index number remained over 365 for two consecutive weeks, the airline would

increase its fuel surcharge by $.05 USD/kg to a new level of $.55 USD/kg or EUR/kg.

93.    Lufthansa's methodology was easily followed by all Defendants, with the result

of nearly identical Fuel Surcharges from all Defendants.  For example, according to travel

industry analyst Christopher Elliot, in 2002, a United Airlines spokesman responded to a

reporter's question on the disparity between Surcharges and actual external costs by saying "*We*

*charge what everyone else charges* . . . ." Christopher Elliott: *A Profit 'Surcharge,'* Elliott

Publishing, March 1, 2002, at 1 (emphasis supplied) (available at <

http://www.elliott.org/vault/oped/2002/charge.htm >).

94.    On or about July 4, 2005, Defendant Lufthansa and others announced lockstep

increases to their Fuel Surcharges, to $.45 per kilogram.

95.    By late August or early September of 2005, several Defendants implemented their

Fuel Surcharge increases, including several Defendants.

(<http://www.kweusa.com/newsroom/IU/Industry%20Update%209.05.pdf>)

96.    To increase even further the profits yielded to Defendants by applying the

publicly available Lufthansa Fuel Surcharge, Lufthansa announced publicly on August 22, 2005,

that the airline had added new levels to its fuel index.  Under the new added index methodology,

if their index number remains over 390 for two consecutive weeks, the airline will increase its fuel surcharge to a new level of $.60 USD/kg or EUR/kg. The index today stands nearly 40 percent ahead of where it stood one year ago.

97.    The most recent Fuel Surcharge increase was in February of 2006 and it was announced by a majority of global carriers. Press reports indicate that many of the Defendants raised their Fuel Surcharges by similar amounts within days of each other. (<http://www.aviationnow.com/avnow/news/channel_awst_story.jsp?id=news/022006p3.xmlLuf thansa Fuel Index 390>)

98.    But for Defendants' Airfreight Carrier cartel, Defendants would have been unable to perpetrate the extent to which they increased the prices of their Fuel Surcharges. As the head of one freight forwarders' association was quoted as saying (<http://www.aircargoworld.com/break_news/02172006d.htm >):

> "Shippers are entitled to expect to operate in an environment of keen commercial competition regarding both cost and service, and events in the recent past have created doubts in confidence," said Andrew Traill, head of air freight policy for the British Freight Transport Association. Traill added it is remarkable when one carrier sets a surcharge "how quickly the airlines follow suit, and with a very similar charge."

99.    The same article quotes Peter Gatti, executive vice-president of the National Industrial Transportation League that represents major freight-system customers as follows:

> One issue is that many carriers are imposing the same level of extra fee as competitors, regardless of an individual carrier's cost structure. "There is nothing illegal about a carrier building in an additional charge over the basic charge," he said. "What is illegal is if everybody is using the same level of surcharge. You then could have a prima facie case that the airlines are colluding. If there is no deviations among the airlines subscribing to an index [used to set the fuel fees], there could be a cause for [the U.S. Department  of] Justice to look at that."

100.     Due to Defendants' concerted action, prices of the Fuel Surcharges charged to Airfreight Customers were raised to or maintained at supra-competitive levels throughout the Class Period.

### Security Surcharge

101.     The Defendants' Surcharge scheme expanded and intensified following the terrorist attacks upon the United States on September 11, 2001, when Defendants opportunistically agreed to further leverage their cartel power to charge their Airfreight Customers still more and higher Surcharges.

102.     Following the September 11 attacks, Defendants together demanded of their Airfreight Customers higher Fuel Surcharges, and additionally instituted a new type of Surcharge, purportedly to offset costs for additional airline security measures such as reinforced walls between cockpits and cabins ("Security Surcharge").

103.     Defendants were able to facilitate and continue this additional Security Surcharge agreement throughout the Class Period by exchanging information on the Security Surcharges both in secret and by publicly announcing agreed-upon Surcharge increases.

104.     Lufthansa led the way in using the press to signal the inception of their Security Surcharge. A TIACA article from that period indicates the concerted action of the dominant Airfreight Carriers by stating that Lufthansa Cargo would:

> impose a security surcharge of 10 cents per kilo on airborne exports from the U.S., effective Oct. 8. The surcharge for shipments from Europe will be €0.15 per kilo. Cargolux Airlines is also imposing a surcharge of €0.15 per kilogram, effective Oct. 8. The surcharge for shipments from the U.S. will be 15 cents per kilo. Air France Cargo officials are expected to decide Tuesday what kind of surcharge, if any, they will be putting in place.

(<http://www.tiaca.org/articles/2001/10/02/ A97C93DB38D24219B3A300B1 A9C9E04.asp>).

105.    As with increases in Fuel Surcharges, increases in Security Surcharges are typically uniform. Tim Sailor of Navigo Consulting, a freight shippers' advisory firm located in Long Beach, California, has been quoted as saying: "we have already seen little distinctions between the airlines with accessorial fees, especially fuel and security add-on charges." (<http://www.aircargoworld.com/break_news/02172006d.htm >).

106.    But for Defendants' Airfreight Carrier cartel, Defendants would have been unable to institute, implement or facilitate this Security Surcharge, or to perpetrate the extent to which they increased the prices of their Security Surcharges.

107.    Due to Defendants' concerted action, the Defendants' Security Surcharges were implemented and charged to Airfreight Customers at supra-competitive price levels throughout the Class Period.

### War Risk Surcharge

108.    Following the outbreak of the war in Iraq in 2003, Defendants again seized upon what would be for them a profitable turn in world events and agreed to together demand still-higher Fuel Surcharges and Security Surcharges, and also to institute another new Surcharge.

109.    At the start of aggressions in Iraq, Defendants agreed to and did concertedly institute a new Surcharge, with the purported purpose of offsetting increased costs of war-risk insurance premiums ostensibly applied to the airlines by insurance providers in conjunction with that war ("War Risk Surcharge"). (*See* <http://www.us.danzas.com/frameset.cgi?winLocation=http://www.us.danzas.com/worldwide/northamerica/resource/395.html>)

110.    Defendants were again able to facilitate and continue this additional War Risk Surcharge agreement throughout the Class Period by exchanging information on the agreed-upon War Risk Surcharge increases.

111.    But for Defendants' Airfreight Carrier cartel, Defendants would have been unable to institute, implement or facilitate their War Risk Surcharges, or to perpetrate the extent to which they increased the prices of their War Risk Surcharges.

112.    Due to Defendants' concerted actions, the Defendants' Security Surcharges were implemented and charged to Airfreight Customers at supra-competitive price levels throughout the Class Period.

## DEFENDANTS PROFITED FROM THE SURCHARGES

113.    Because surcharges generally are designed to compensate for increased external costs, they should bear a relatively constant relationship to external cost levels.  Thus, in a competitive market, when the costs of jet fuel, security costs, or war risk insurance premiums fall, surcharges should fall as well, at relatively constant ratios to the associated.

114.    But since approximately 2000, the ratio of Defendants' Surcharges to external costs has increased steadily.  For example, as of March 2002, when the cost of a gallon of jet fuel plummeted to $.55, compared with $.85 one year before, Defendants' Fuel Surcharge prices remained at a proportionately higher level.

115.    According to *Bloomberg News*, cargo airlines often work together to carry freight, setting aside as much as 10 percent of space for partners. (<http://www.bloomberg.com/apps/news?pid=10000102&sid=aqRkJE_Olm50>).  For example, Defendant Lufthansa and Swiss Airlines concluded an agreement in late 2005 for capacity

cooperation. (<http://www.swissworldcargo.com/web/MACNS4/index/about-us/au-nw-press-releases-archive.htm?newsid=10397>).

116.    As Defendants controlled a vast majority of the Airfreight Shipping services during the Class Period with their dominant combined market share, compounded by the Airfreight Carriers' self-imposed supply restriction in the form of their ten percent cargo capacity reservation for other carriers, Airfreight Customers were unable to shop their freight shipment purchases to lower-charging carriers during that period, which allowed Defendants to reap enormous profits from these Surcharges.

117.    The ratio of Defendants' profits to external costs was therefore quite high due to the concerted implementation and maintenance of the agreed-upon Surcharge levels.  So despite record fuel costs in 2005, Defendants' Surcharges were actually responsible for outstanding *profit growth* for Defendants. According to *Bloomberg News*, for example, Lufthansa stated in January of 2006 that its "2005 operating profit surged 44 percent to about 550 million euros *because of fuel surcharges*." Andrea Rothman, "Air France-KLM Profit Probably Jumped on Trans-Atlantic Demand," *Bloomberg News*, February 15, 2006, at 1 (available at <http://www.bloomberg.com/apps/news?pid =10000172&sid=aSSp2zt8W1Kg&refer=market_insight>). This was due in no small part to the fact that Lufthansa, like other airlines, succeeded in hedging the prices it paid for fuel so that spot market increases did not affect it unduly. Lufthansa was reported as hedging the prices on 90 percent of its fuel requirements in 2004 and at least 50 percent in 2005. (<http://www.prni.com/cgi-bin/stories.pl?ACCT=105&STORY=/www/story/08-12-2004/0002230774>).

118.    Likewise, the AAPA reported that air cargo revenues constituted a significant percentage for some of its members: 32.7 percent for Korean Air, 29 percent for Asiana and 28.5 percent for Cathay Pacific. (http://www.atimes.com/atimes/China_Business/HB22Cb05.html.)

**DEFENDANTS KNEW THAT THEIR FUEL SURCHARGE PRICE INCREASES WERE FUNDAMENTALLY FLAWED, UNFAIR TO SHIPPERS, AND ADVERSE TO THE PUBLIC INTEREST**

119.    In 1997, members of IATA adopted Resolution 116ss, which would establish a coordinated Fuel Surcharge price index mechanism based on variations in jet fuel spot prices. The mechanism was intended to simultaneously raise Fuel Surcharge that IATA member Airfreight Carriers levied on their Airfreight Customers when the fuel spot prices reached predetermined levels and/or remained for a certain length of time at predetermined price levels.

120.    The association didn't present the resolution to the United States Department of Transportation ("DOT") for approval until January of 2000, because it did not believe it could present the economic justification for the resolution that DOT would require in order to grant antitrust immunity. IATA's application sought such immunity for the establishment, implementation and continuation of what DOT called this "uniform, industry-wide mechanism to surcharge cargo rates." "Agreements adopted by the Tariff Coordinating Conferences of the International Air Transport Association relating to cargo rate matters," DOT Order No. 2000-3-7 at 1 in Docket OST-2000-6837-2 (served on March 17, 2000) (available at <http://dmses.dot.gov/docimages/pdf44/74369_web.pdf>).

121.    In the order, DOT denied IATA and its members antitrust immunity for their Fuel Surcharge index mechanism, and disapproved of the IATA index mechanism as "***fundamentally flawed and unfair to shippers and other users of cargo air transportation***" who could be subjected to "***unjustified and unwarranted rate increases.***" *Id.* at 2 (emphasis supplied).

122.    The DOT further objected that the IATA mechanism was based on the spot price variations, rather than on actual prices, which allowed IATA to report to the U.S. DOT a fuel cost percentage increase over *five times higher than that reported for actual prices*. *See id.* As the order stated:

> Moreover, IATA's proposed index mechanism, which reflects the volatile nature of the spot market, is at best an imperfect measure of the impact of fuel price increases on carriers. ***Most carriers employ fuel-hedging programs, which they use to limit the effects of jet fuel price volatility*** and thus discipline their costs. Indeed, under these programs, ***many prudent carriers manage to hedge between 70-80 percent of their total fuel needs.*** . . . [T]he difference between the average actual fuel prices, as reported to the Department . . . increased about six percent, while ***IATA's index, based on spot market prices, showed a 34 percent increase over the same period.***

*Id.* (emphasis supplied).

123.    According to the DOT, the IATA fuel surcharge mechanism agreement had "direct application in foreign air transportation," and that the resolution seeking antitrust immunity was "*adverse to the public interest.*" *Id.* at 3 (emphasis supplied).

124.    Defendant IATA and all Airfreight Carrier Defendants therefore knew or should have known as of March 17, 2000 that such a coordinated spot-price Fuel Surcharge mechanism had been specifically denied antitrust immunity.

125.    Despite the U.S. DOT decision, and despite being on notice that a Fuel Surcharge price increase mechanism such as that proposed by IATA was not shielded from the antitrust laws of the United States and moreover was "fundamentally flawed," "unfair to shippers," and "adverse to the public interest," the Airfreight Carrier Defendants, with full knowledge by Defendant IATA, nevertheless concertedly established, implemented, and continued their agreed-upon and coordinated Fuel Surcharge price increases.

## THE INVESTIGATIONS

126.    Beginning on February 13, 2006 antitrust investigators from four continents, including the European Commission ("EC"), the DOJ, the U.S. Federal Bureau of Investigation ("FBI"), the Swiss competition authority Weko, U.K. antitrust officials, South Korea's Fair Trade Commission ("KFTC"), and the Competition Bureau of Canada, raided or initiated investigations of each of the above-named Defendants in an unprecedented, global investigation into Defendants' Surcharge cartel.

127.    A spokesperson for the DOJ stated that the "industry-wide" investigation focused on "the possibility of anticompetitive practices in the in the air cargo industry." (<http://money.excite.com/jsp/nw/nwdt_rt.jsp?section=news&news_id=dji-00063020060214&feed=dji&date=20060214&cat=INDUSTRY>).

128.    On February 15, 2006 the EC released a statement declaring that the Commission has reason to believe that the companies concerned may have violated (a European Union) treaty, which prohibits practices such as price fixing.

129.    In various regulatory filings and press statements, the Defendants acknowledged these raids and investigations.

130.    British Airways admitted that it had received requests for information from the EC and the DOJ, that FBI agents raided its offices at John F. Kennedy Airport in New York, and that U.K. antitrust officials raided its offices at Heathrow airport in London.

131.    Air France-KLM confirmed on February 15, 2006 that EC officials had raided its offices in Paris.

132.    JAL announced that EC authorities had raided its offices in Frankfurt, Germany.

133.    Korean Air admitted that the KFTC had raided its South Korean offices.

356202-1

134.    Asiana also confirmed that the KFTC had raided its South Korean offices, and admitted that the raid concerned fuel surcharges and price-fixing practices.

135.    Cathay Pacific stated that EC and DOJ officials had raided its offices in Frankfurt, Germany, Los Angeles and San Francisco.

136.    United Airlines admitted that EC investigators raided its Frankfurt, Germany offices.

137.    SAS confirmed that antitrust investigators had raided its Stockholm, Sweden offices.

138.    According to a *Forbes* article from February 16, 2006 (available at < http://www.forbes.com/home/feeds/ap/2006/02/16/ap2531339.html>), Defendant SAS Group stated that it understood from the investigators that the investigation focused on the Airfreight Carriers' "agreements regarding certain surcharges to offset external cost increases, such as fuel surcharges, costs for additional security measures after the attack in the U.S. in September 2001 and surcharges for war-risk insurance premiums applied in conjunction with the outbreak of war in Iraq in 2003." Kelly Olsen: "Update 7: Three Airlines Confirm Price Fixing Probe," *Associated Press – Forbes.com*, February 16, 2006, at 1.

139.    SAS Group also stated that "the EU has alleged that cooperation among airlines began in 2000 and involved agreements about surcharges imposed by airlines to offset certain external costs." *Id.*

140.    On February 14, 2006, Atlas stated that its subsidiary Polar Air received a formal request for information from the U.S. Government in connection with an investigation into air cargo pricing practices.

141.    On February 14, 2006, Lan Airlines stated that U.S. investigating officials visited its office in Miami, Florida.

142.    On February 14, 2006, Cargolux stated that it received a request for information and a visit from EC officials as well as DOJ officials in its US offices.

143.    The *Taipei Times* reported that several Asian cargo airlines, including Singapore Airlines, all confirmed authorities had questioned them.
(<http://www.taipeitimes.com/News/worldbiz/archives/2006/02/17/2003293431>)

144.    On February 15, 2006, Reuters reported that authorities had contacted Swiss International as a part of the investigation.
(<http://www.boston.com/news/world/europe/articles/2006/02/15/global_airlines_cargo_probe_widens_to_asia/>)

145.    On February 16, 2006, *Bloomberg News* reported that a spokesman for Air Canada stated on February 15, 2006 that the carrier had received a letter from the Competition Bureau of Canada indicating that the agency "has begun an investigation into the activities of air carriers engaged in the provision of international air cargo services to and from Canada."
(<http://iht.com/articles/2006/02/15/business/cartel.php>).

146.    On February 16, 2006, the *Taipei Times* reported that "Nippon Cargo Airlines said officials from the U.S. District Court of the District of Columbia left papers at the company's office at New York's John F. Kennedy airport Tuesday to appear at the court by April, according to spokesman Yuhei Yamashita."
(<http://www.taipeitimes.com/News/worldbiz/archives/2006/02/17/2003293431/print>)

147.    On February 16, 2006, it was reported that Virgin Atlantic's United States cargo operations had received a request for information from the DOJ in connection with the

worldwide Surcharge investigation.

(http://news.morningstar.com/news/DJ/M02/D16/200602160755DOWJONESDJONLINE00060
1.html?Cat=Services.)

## VIOLATIONS ALLEGED

148.    Plaintiff incorporates by reference as if fully set forth herein the allegations
contained in the preceding paragraphs of this Complaint.

149.    During the Class Period, the exact dates being unknown to Plaintiff, Defendants
engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to
artificially raise, fix, maintain, and/or stabilize the prices of Fuel, Security, and War Risk
Insurance Surcharges, and possibly other surcharges, in the United States and throughout the
world in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

150.    In formulating and effectuating the alleged contract, combination, or conspiracy,
Defendants engaged in anti-competitive activities, the purpose and effect of which were to
artificially raise, fix, maintain, and/or stabilize the prices of Surcharges for Fuel, Security, and
War Risk Insurance Premiums.  These activities included the following:

a.      agreeing to charge prices of Surcharges at certain levels and otherwise to
fix, raise, maintain, and/or stabilize the prices of Surcharges charged in the United States and
throughout the world;

b.      charging Surcharges at the agreed-upon rates;

c.      signaling increases in the price of Surcharges by, *inter alia*, publicly
announcing Surcharge increases;

d.      moving prices of their Surcharges in lock-step; and

e.      announcing new Surcharge prices nearly simultaneously.

151.    During the Class Period, the Defendants increased, as a ratio to external costs –

and profits -- the Surcharges they charged.  These relative increases in Surcharges cannot be

explained by actual increases in fuel prices, security measures, or war risk premiums, or

supply/demand forces, but rather were the result of anticompetitive conduct.

152.    During the Class Period, Plaintiff and members of the Class paid Surcharges

directly to Defendants (or their agents, subsidiaries, and/or controlled affiliates).

153.    The illegal combination and conspiracy alleged herein has had the following

effects, among others:

      a.    price competition in the charging of Surcharges has been restrained,

suppressed, and/or eliminated;

      b.    price competition in the contracting of airfreight transportation has been

restrained, suppressed, and/or eliminated;

      c.    Surcharges charged by Defendants have been fixed, raised, maintained,

and/or stabilized at artificially high, non-competitive levels; and

      d.    members of the Class have been deprived of the benefit of free and open

competition.

## **FRAUDULENT CONCEALMENT**

154.    Throughout the relevant period, Defendants affirmatively and fraudulently

concealed their unlawful conduct against Plaintiff and the Class.

155.    Plaintiff and the members of the Class did not discover, and could not discover

through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as

alleged herein until shortly before this litigation was commenced. Nor could Plaintiff and the

members of the Class have discovered the violations earlier than that time because Defendants

conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. The conspiracy was by its nature self-concealing.

156.    Only on or about February 13, 2006, when several Airfreight Carriers admitted being raided by the EC, the DOJ, the FBI, the Swiss competition authority Weko, U.K. antitrust officials, the KFTC, and the Competition Bureau of Canada, in a coordinated global investigation into the Airfreight Carriers' cartel was the existence of the conspiracy disclosed to the public. Plaintiff and the members of the Class could not have discovered the unlawful conduct at an earlier date through the exercise of reasonable diligence because of Defendants' active and purposeful concealment of their unlawful activities.

157.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to Surcharges, which they affirmatively concealed, in at least the following respects:

        a.      by agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

        b.      by engaging in secret meetings under the auspices of IATA or other organizations in order to further their illicit Surcharge cartel; and

        c.      by giving false and pretextual reasons for their Surcharges and Surcharge increases during the relevant period and by describing such pricing falsely as being the result of external costs rather than collusion.

158.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

## INJURY TO PLAINTIFF AND THE CLASS

159.    During the Class Period, Plaintiff and the members of the Class, because of Defendants' antitrust violations, paid Surcharges they would not have paid absent such violations.  As a result, Plaintiff and the members of the Class it seeks to represent have been injured and damaged in their business and property in an amount to be determined according to proof.

160.    As a direct and proximate result of the illegal conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they have paid Surcharges during the Class Period they would not have paid in the absence of the illegal conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

B.    The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.    Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and the Class for damages as allowed by law as determined to have been sustained by them.

D.    Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently

enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

      E.     The Court award Plaintiff and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

      F.     The Court award Plaintiff and the Class such other and further relief as may be necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: April 25 , 2006

Respectfully submitted,

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.LC.**

By: _____

Michael D. Hausfeld DC Bar No 153742
Paul T. Gallagher
Andrew B. Bullion
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20008
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: mhausfeld@cmht.com
      pgallagher@cmht.com
      abullion@cmht.com

W. Joseph Bruckner
Richard A. Lockridge
Heidi M. Silton
R. Reid LeBeau II
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: wjbruckner@locklaw.com
        ralockridge@locklaw.com
        hmsilton@locklaw.com
        rrlebeau@locklaw.com


*Attorneys for Plaintiff*
*Floral Network LLC, d/b/a*
*Floral Network*